# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with accounts identified as the<br>Google account assigned Google Voice phone<br>number 408-883-5483, further described in<br>attachment A-2 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 2:22-mj-01913

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A-2*

There are now concealed or contained the items described below:

*See Attachment B-2*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☑ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 18 U.S.C. §§ 875 and 876 | Threats to Extort |
| 18 U.S.C. §§ 2422(b) | Coercion and Enticement of a Minor |
| 18 U.S.C. § 2251(a),(e) | Production of Child Pornography |
| 18 U.S.C. § 2252A(a)(2) | Receipt and Distribution of Child Pornography |
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of Child Pornography |
| 18 U.S.C. § 1030(a)(4) | Unauthorized Access to Protected Computer with Intent to Defraud |
| 18 U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

*Nathaniel L. Hines*
_____
*Applicant's signature*

SA Nathaniel L. Hines, FBI
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and State: _____

Hon. Louise A. LaMothe, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Kevin Butler (213-894-6495)

### ATTACHMENT A-2: Google LLC

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the SUBJECT ACCOUNT identified as the Google account assigned Google Voice phone number 408-883-5483 ("SUBJECT ACCOUNT 7) on September 18, 2021, that is within the possession, custody, or control of Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, CA 94043, regardless of where such information is stored, held, or maintained.

## ATTACHMENT B-2: Google LLC

## ITEMS TO BE SEIZED

**I.  SEARCH PROCEDURES**

1.   The warrant will be presented to personnel of Google LLC, (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.   To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.   The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.   With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images

of child pornography.  The review of the electronic data may be
conducted by any government personnel assisting in the
investigation, who may include, in addition to law enforcement
officers and agents, attorneys for the government, attorney
support staff, and technical experts.  Pursuant to this warrant,
the investigating agency may deliver a complete copy of the
seized, copied, or disclosed electronic data to the custody and
control of attorneys for the government and their support staff
for their independent review.

5.   If the search team encounters immediately apparent
contraband or other evidence of a crime outside the scope of the
items to be seized, the team shall immediately discontinue its
search pending further order of the Court and shall make and
retain notes detailing how the contraband or other evidence of a
crime was encountered, including how it was immediately apparent
contraband or evidence of a crime.

6.   The search team will complete its search of the
content records as soon as is practicable but not to exceed 120
days from the date of receipt from the PROVIDER of the response
to this warrant.  The government will not search the content
records beyond this 120-day period without first obtaining an
extension of time order from the Court.

7.   Once the search team has completed its review of the
content records and created copies of the items seized pursuant
to the warrant, the original production from the PROVIDER will
be sealed -- and preserved by the search team for authenticity
and chain of custody purposes -- until further order of the

Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   INFORMATION TO BE DISCLOSED BY THE PROVIDER

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, from the date of the account's creation to the present as the account is believed to have been used predominantly for criminal activity, and to mask the criminal's true identity,[5] including:

---

[5] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not

*(footnote cont'd on next page)*

i.   All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken;

iv.   All stored passwords, including passwords stored in clear text and hash form, and for any hashed values that include a salt, the PROVIDER shall provide the salt value used to compute the stored password hash value, and any security questions and answers;

v.   All search history and web history, including web clicks or "History Events," by the user of the SUBJECT ACCOUNT;

---

available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

vi.  All web browsing activities that are identifiable with the SUBJECT ACCOUNT.

vii. All other records of communications and messages of any kind made or received by the user, including all private messages, history of any kind of messages or communications, and video calling history, and where such records exist, the identity of any other user or account with which the SUBJECT ACCOUNT was connected;

viii.   All records (including content records and the stored application data) pertaining to any Google service associated with the SUBJECT ACCOUNT, including services such as Gmail, Android, Google Play and Android Market (including payment information), Google Groups, Google Dashboard, Google Code, use of Google Chrome or Google Chrome Sync (including the content of the data that is synced between different devices and the identity of such devices), Google Reader, Google Translate or Google Translator Toolkit, Google Talk, Google Calendar, Google Docs, Google Drive, Google News, Google Reader, Google Services, Google+, Has Google Profile, Has Plusone, Google Photos (formerly Picasa), YouTube, Tasks, iGoogle, Web History, Google Talk, Google Voice, and Hangouts;

ix.  All records (including content records and the stored application data) associated with the SUBJECT ACCOUNT pertaining to Location History and Google Maps, including [choose as applicable – Google runs a separate query for each] custom maps, changes and edits to public places, starred places, private labels of locations, and saved locations.

x.   All records related to Google's FeedBurner service, including both contents or sources read or subscribed to as well as any content published or disseminated via FeedBurner related to the SUBJECT ACCOUNT.

xi.  For any Android Device associated with any SUBJECT ACCOUNT, all subscriber records, transactional information, search query history, browsing history, machine cookies, e-mail accounts ever linked to, Google Maps location information or other location information or history, Google Location history, application data from any Applications or "Apps," sensor data from the user's device that includes information on nearby Wi-Fi access points and cell towers, Face Unlock information (stored images), list of installed applications, operating system versions, phone numbers, International Mobile Station Equipment Identity (IMEI), Mobile Equipment Identifier (MEID), call logs, stored text messages, voicemails, stored photos, contacts lists, favorites lists, synced Twitter/Facebook accounts, device information (serial numbers, make, model), clock and calendar time zone settings, stored memos and notes, device security settings, and any files associated with the SUBJECT ACCOUNT;

b.   All other records and information, including:

i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked

accounts, telephone numbers, physical addresses, and other
identifying information regarding the subscriber, including any
removed or changed names, email addresses, telephone numbers or
physical addresses, the types of service utilized, account
status, account settings, login IP addresses associated with
session dates and times, as well as means and source of payment,
including detailed billing records, **and including any changes
made to any subscriber information** or services, including
specifically changes made to secondary e-mail accounts, phone
numbers, passwords, identity or address information, or types of
services used, and including the dates on which such changes
occurred, for the following accounts:

> (I)  the SUBJECT ACCOUNT;

> (II) any other account associated with the
SUBJECT ACCOUNT, including by means of sharing a common
secondary, recovery, or alternate **e-mail address listed in
subscriber records** for the SUBJECT ACCOUNT or by means of
sharing a **common phone number or SMS number listed in subscriber
records** for the SUBJECT ACCOUNT, and any account that lists the
SUBJECT ACCOUNT as a secondary, recovery, or alternate email
address.

> (III)    any other account accessed by a
device with an identifier responsive to the device identifiers
called for in paragraph 10.b.v.

> ii.  All user connection logs and transactional
information of all activity relating to the SUBJECT ACCOUNT
described above in Section II.10.a., including all log files,

dates, times, durations, data transfer volumes, methods of
connection, IP addresses, ports, routing information, dial-ups,
and locations, and including specifically the specific product
name or service to which the connection was made.

          iii. Any and all logs of user activity and user
agent string, including:  web requests or HTTP requests; any
logs containing information such as the Requestor's IP address,
identity and user ID, date and timestamp, request URI or URL,
HTTP protocol version, referrer, and other user agent string
information; login tracker logs; account management logs; and
any other information concerning other e-mail or social media
accounts accessed by or analytics related to the SUBJECT
ACCOUNT;

          iv.  Any and all cookies used by any computer or
web browser associated with the SUBJECT ACCOUNT, including the
IP addresses, dates, and times associated with the recognition
of any such cookie;

          (I)  any other account associated with the
cookie(s) associated with the SUBJECT ACCOUNT.

          v.  Any information identifying the device or
devices used to access the SUBJECT ACCOUNT, including any
Android ID, Advertising ID, unique application number, hardware
model, operating system version, unique device identifier,
Global Unique Identifier or "GUID," serial number, mobile
network information, phone number, device serial number, MAC
address, Electronic Serial Number ("ESN"), Mobile Electronic
Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"),

Mobile Identification Number ("MIN"), Subscriber Identity Module ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identity ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA") or Google's AAID or any other advertiser ID, and any other information regarding the types of devices used to access the SUBJECT ACCOUNT or other device-specific information, including the device type, brand name, device mode or operating system, and first and last times that a device were observed;

vi.  Any information showing the location of the user of the SUBJECT ACCOUNT, including while sending or receiving a message using the SUBJECT ACCOUNT or accessing or logged into the SUBJECT ACCOUNT.

vii. All records related to authenticating the user of the SUBJECT ACCOUNT, including use of two-factor authentication or App passwords used to allow access via a mobile device and the identity of those devices accessing the SUBJECT ACCOUNT;

viii.   All records relating to any settings applied by the user of the SUBJECT ACCOUNT to cause a message to expire, to require a recipient to insert a password value to read a message, to control a recipient's ability to forward a message, or to retract access to a message already sent.

**III. INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.   All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 875&876 (Threats to Extort); 18 U.S.C. §§ 2422(b) (Coercion and Enticement of a Minor); 2251(a),(e) (Production of Child Pornography); 2252A(a)(2) (Receipt and Distribution of Child Pornography); and 2252A(a)(5)(B) (Possession of Child Pornography); 18 U.S.C. § 1030(a)(4) (Unauthorized Access to Protected Computer with Intent to Defraud); and 18 U.S.C. § 1343 (Wire Fraud) (collectively, the "Subject Offenses"), namely:

i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

b.   All records and information described above in Section II.10.b.

**IV.  PROVIDER PROCEDURES**

12.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  Notwithstanding 18 U.S.C. § 2252/2252A or any similar statute or code, the provider shall disclose responsive data by sending it to the following address via US Mail, or to the following email address:

Special Agent Nathaniel L. Hines
Federal Bureau of Investigation
2125 Knoll Drive – 2nd Floor
Ventura, CA 93003
nlhines@fbi.gov

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

14.  IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States. Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 13 above of its intent to so notify.

**AFFIDAVIT**

I, Nathaniel L. Hines, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation, and have been so employed since May 2015. I am assigned to the Ventura Resident Agency of the Los Angeles Field Office in the Central District of California. During my tenure as a Special Agent, I have received training regarding computer technology crimes and crimes against children; and I have conducted and participated in numerous investigations of criminal activity. During these investigations, I have executed and participated in the execution of numerous search and arrest warrants and seized evidence of violations of United States law. I have conducted investigations into computer intrusions; internet enabled financial fraud; and child exploitation and child pornography.

2.    I make this affidavit in support of an application for a warrant for information associated with the following accounts (individually described as "SUBJECT ACCOUNT" followed by a number; collectively described as the "SUBJECT ACCOUNTS") that are stored at premises controlled by the following providers of electronic communication and remote computing services (collectively, the "PROVIDERS"):[1]

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).
                              *(footnote cont'd on next page)*

1

a.    Meta Platforms, Inc., located at 1601 Willow
Road, Menlo Park, CA 94025:

Instagram account @sofia_perez136 ("SUBJECT ACCOUNT 1"),

Instagram account @sofiaperez_201 ("SUBJECT ACCOUNT 2"),

Instagram account @sofiaperez15221 ("SUBJECT ACCOUNT 3"),

Instagram account @sexy-marie5273 ("SUBJECT ACCOUNT 4"),

Instagram account @cthayer25 ("SUBJECT ACCOUNT 5"), and

Instagram account @thejoelbueltel ("SUBJECT ACCOUNT 6") as

described further in Attachment A-1;

b.    At Google, LLC., located at 1600 Amphitheatre
Parkway, Mountain View, California 94025: Google Account using
Google Voice phone number 408-883-5483 ("SUBJECT ACCOUNT 7"), as
described further in Attachment A-2; and

c.    At Apple, Inc., located at One Apple Park Way,
MS: 169-5CLP, Cupertino, CA 95014: Apple account using phone
number 973-963-5762 ("SUBJECT ACCOUNT 8"), as described further
in Attachment A-3.

The information to be searched is described in Attachments A-1
through A-3.  This affidavit is made in support of an
application for a warrant under 18 U.S.C. §§ 2703(a),

---

See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the
disclosure by a provider . . . pursuant to a warrant issued
using the procedures described in the Federal Rules of Criminal
Procedure . . . by a court of competent jurisdiction") and 2711
("the term 'court of competent jurisdiction' includes -- (A) any
district court of the United States (including a magistrate
judge of such a court) or any United States court of appeals
that -- (i) has jurisdiction over the offense being
investigated; (ii) is in or for a district in which the provider
of a wire or electronic communication service is located or in
which the wire or electronic communications, records, or other
information are stored; or (iii) is acting on a request for
foreign assistance pursuant to section 3512 of this title").

2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the
PROVIDERS to disclose to the government copies of the
information (including the content of communications) described
in Section II of Attachments B-1 through B-3.  Upon receipt of
the information described in Section II of Attachments B-1
through B-3, law enforcement agents and/or individuals assisting
law enforcement and acting at their direction will review that
information to locate the items described in Section III of
Attachments B-1 through B-3.  Attachments A-1 through A-3 and B-
1 through B-3 are incorporated herein by reference.

    3.   As described more fully below, I respectfully submit
there is probable cause to believe that the information
associated with the SUBJECT ACCOUNTS constitutes evidence,
contraband, fruits, or instrumentalities of criminal violations
of 18 U.S.C. §§ 875 and 876 (Threats to Extort); 18 U.S.C. §§
2422(b) (Coercion and Enticement of a Minor); 18 U.S.C.
§ 2251(a),(e) (Production of Child Pornography); 18 U.S.C.

---

[2] The government is seeking non-content records pursuant to
18 U.S.C. § 2703(d).  To obtain the basic subscriber
information, which does not contain content, the government
needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To
obtain additional records and other information--but not
content--pertaining to subscribers of an electronic
communications service or remote computing service, the
government must comply with the dictates of section
2703(c)(1)(B), which requires the government to supply specific
and articulable facts showing that there are reasonable grounds
to believe that the records or other information sought are
relevant and material to an ongoing criminal investigation in
order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The
requested warrant calls for both records containing content (see
Attachments B-1 through B-3 paragraphs II.10.a.) as well as
subscriber records and other records and information that do not
contain content (see Attachments B-1 through B-3 paragraphs
II.10.b.).

§ 2252A(a)(2) (Receipt and Distribution of Child Pornography);
18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography);
18 U.S.C. § 1030(a)(4) (Unauthorized Access to Protected
Computer with Intent to Defraud); and 18 U.S.C. § 1343 (Wire
Fraud) (collectively, the "Subject Offenses").

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.  This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrant and does not purport to
set forth all of my knowledge of or investigation into this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## II.  <u>SUMMARY OF PROBABLE CAUSE</u>

5.    The FBI is currently investigating sextortion, child
pornography production, and blackmail of ten teenage male
victims in Ventura County, California, Orange County,
California, and around the United States, by an Unknown Subject.
Five of the victims were minors.

6.    During the course of the sextortion and threats made
by the Unknown Subject, one of the victims committed suicide by
hanging in Ventura, California.

7.    The Unknown Subject generally presented as a teenage
girl named "Sofia Perez" on Instagram, and lured the victims
into a conversation that usually migrated to WhatsApp.  The
Unknown Subject used sexual intrigue to trick the boys into

sending nude images of themselves to the Unknown Subject.  The Unknown Subject then blackmailed the victims for money by threatening to distribute the victims' images over the internet to family, friends, school peers, and/or employer contacts if the victims did not pay the Unknown Subject money.

8.   Between May 2021 and February 2022, The Unknown Subject used the following communication accounts to converse with his victims:

a.   Instagram account @sofia_perez136 ("SUBJECT ACCOUNT 1");

b.   Instagram account @sofiaperez_201 ("SUBJECT ACCOUNT 2");

c.   Instagram account @sofiaperez15221 ("SUBJECT ACCOUNT 3");

d.   Instagram account @sexy-marie5273 ("SUBJECT ACCOUNT 4");

e.   Snapchat Account @sofiaperez4846;

f.   WhatsApp Account 408-883-5483;

g.   Google Voice phone number 408-883-5483 ("SUBJECT ACCOUNT 7")[3]; and

h.   Apple account with phone number 973-963-5762 ("SUBJECT ACCOUNT 8").

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

9.   The following is based on information I learned from my conversations with FBI agents and other law enforcement

---

[3] The number associated with SUBJECT ACCOUNT 7 and the Unknown Subject's WhatsApp account are identical.

officials, my own participation in the investigation, and my training and experience.

**A.   Ventura County Sheriff's Office Notifies FBI of Sextortion Victim who Committed Suicide by Hanging**

10.   On December 7, 2021, FBI Special Agent Joseph Hamer was contacted by Ventura County Sheriff's Detective Jason Cantrell regarding a sextortion case that resulted in the death of an 18-year-old Victim, ("A.O."), Date of Birth (DOB) January 23, 2003.  During the course of the sextortion and threats made by an Unknown Subject, A.O. committed suicide by hanging. A summary of Det. Cantrell's investigation was as follows:

a.   On December 6, 2021, A.O. sent nude images of himself to an Unknown Subject, who had was posing as a blonde female teenager, based on photographs sent to A.O., using Instagram account @Sofiaperez_201 ("SUBJECT ACCOUNT 2") and WhatsApp Account 408-883-5483.  The Unknown Subject then threatened to distribute A.O.'s images on social media if A.O. did not pay the Unknown Subject.  According to [what], A.O. made three $500 payments in Apple gift cards and a possible $1000 payment via Venmo.

b.   The name "Sofia Perez," which was associated with "SUBJECT ACCOUNT 2," messaged A.O. and requested to chat on WhatsApp providing the phone number 408-883-5483.  The Detective Cantrell summarized the WhatsApp conversation between A.O. and the Unknown Subject, beginning on December 6, 2021, as follows:

i.   The Unknown Subject asked A.O. to show her how cute he was "from the head to the cock."  The Unknown

Subject sent a photo of a naked female with her breasts covered with a coffee cup emoji then said it was his turn. A.O. sent a message that was deleted at 1216 hours. The Unknown Subject then sent a full nude picture. A.O. sent another message that was deleted at 12:17 p.m.. The female asked to see full photos of A.O. and then she will send whatever he wants. A.O. sent a message that was deleted at 12:18 p.m. There were several sexual messages sent between both parties. At 12:24 p.m., Unknown Subject sent the message "Here you go bab" and then sent photos of A.O.'s nude photo, his social media contacts, and phone number 805-338-0339. A.O.'s penis was circled in red marking. Following these photos the female messaged, "Please don't make me do what I don't wanna do..... I will destroy your reputation and make people run away from you. I will post your nude pictures to all social medias FB, Instagram, and Twitter. I will make sure you get embarrassed and disgraced everywhere you go.... I'll tag you so all your family, friends, and everyone can see it. Don't try to play me games or block me just get me what I want and we end this ELSE I will destroy you." "JUST PAY ME $500 AND WE END IT HERE ELSE IM GOING TO RUIN YOU." "IM HEARTLESS AND WICKED." "ARE YOU PAYING OR I SHOULD START SENDING THEM NOW!" "I HAVE TO START SENDING NOW." The Unknown Subject then sent a photo of A.O.'s nude photo and a social media contact "Eadan." A.O. responded he would send money. Unknown Subject said she will unsend and to get her a "Steam Wallet."

11.   Unknown Subject told A.O. to send money to the PayPal account migwimaina@outlook.com, the Venmo account @Heather-Brooks-135, and the Venmo account @Lane-Shartavious.

   **B.   FBI Identified Nine Additional Victims, Including Five Juvenile Victims, who were Enticed into Self-Producing Child Pornography then Blackmailed for Money**

12.   A search of law enforcement databases and open source internet searches for information and reports related to the Unknown Subject's Instagram account @Sofiaperez_201 ("SUBJECT ACCOUNT 2") and WhatsApp Account 408-883-5483 found nine additional victims had reported to law enforcement they had been enticed and blackmailed by the Unknown Subject.  The victims reported that the Unknown Subject presented as a girl their age, who was sexually interested in them, and the victims sent the Unknown Subject sexually explicit images of themselves after the Unknown Subject requested them.  The Unknown Subject then threatened to distribute the victims' images over the internet to family, friends, school peers, and/or employer contacts if the victims did not pay the Unknown Subject money.

13.   Five of the victims were minors.  [Given the content of the communications, the requests, and the subsequent extortion,] the images the minors reported sending to the Unknown Subject -- which included photographs and videos -- likely constituted child pornography.

14.   I believe all ten victims were enticed and blackmailed by the same Unknown Subject based on the similarity of the incident schemes and common communication accounts used in the enticements.

15.   A chronological summary of each additional incident follows:

**C.   Child Pornography Production and Sextortion of 14-Year-Old Victim S.M. on May 30, 2021, in Greenwood Village, Colorado**

16.   According to Greenwood Village Police Department report, on May 30, 2021, 14-Year-Old Victim S.M. reported that he had been enticed over Instagram and WhatsApp into sending nude photos of himself to an Unknown Subject and then threatened to pay money otherwise the nude photos he sent would be released to his social media contacts.  According to the police report, S.M. had met the Unknown Subject over Instagram presenting as a girl named "Marie."  The Unknown Subject transitioned their conversion to WhatsApp Account 408-883-5483.  Over WhatsApp, the Unknown Subject and S.M. exchanged.  The nude photos of S.M. also showed his face. The Unknown Subject then threatened to distribute S.M.'s photos to S.M.'s friends and school contacts on social media if S.M. did not pay $500.  S.M. did not send the Unknown Subject money or provide his account password.

**D.   Child Pornography Production and Sextortion of 16-Year-Old Victim J.K. on July 1, 2021, in Huntington Beach, California.**

17.   According to a Huntington Beach Police report, On July 12, 2021, 16-Year-Old Victim J.K. reported that he had been enticed over Instagram and WhatsApp into sending nude photos of himself to an Unknown Subject and then threatened to pay money otherwise the nude photos he sent would be released to his social media contacts.  Huntington Beach Police Officer Stephanie Cortez interviewed J.K.  According to the police

report, J.K. said that on September 4, 2021, he was contacted by
an Unknown Subject via Instagram account @sexy-marie5273
("SUBJECT ACCOUNT 4") that was presenting as a 17-year-old girl
from Fresno, California.  The Unknown Subject then directed the
conversation to WhatsApp where the Unknown Subject used WhatsApp
Account 408-883-5483.  The Unknown Subject and J.K. exchanged
nude photos, and J.K. sent SUBJECT ACCOUNT 4 a nude photo of
himself via WhatsApp.  The Unknown Subject then threatened to
distribute J.K.'s nude photo to J.K.'s friends and family via
social media if J.K. did not pay $500 in the form of gift cards.
J.K. purchased $220 dollars in Apple gift cards and $80 in Steam
gift cards; and at the Unknown Subject's direction, sent photos
of the gift cards' information to the Unknown Subject.

   **E.   Child Pornography Production and Sextortion of 17-
        Year-Old Victim L.B. on September 4, 2021, in Eugene,
        Oregon**

   18.  According to a Eugene Police Department report, on
September 6, 2021, 17-Year-Old Victim L.B. and his parents
reported that L.B. had been enticed online into sending nude
photos of himself and then threatened to pay money otherwise the
nude photos he sent would be released to his social media
contacts.  According to the police report,  L.B. said that on
September 4, 2021, he was contacted by an Unknown Subject via
Instagram account @sofia_perez136 ("SUBJECT ACCOUNT 1").  The
Unknown Subject then directed the conversation to WhatsApp where
the Unknown Subject used WhatsApp account 408-883-5483.  The
Unknown Subject who presented as a girl, exchanged nude
photographs with L.B., and L.B. sent nude photos of himself that

included his face.  The Unknown Subject then threatened to
distribute L.B.'s images online to L.B.'s Instagram friends, if
L.B. did not pay $500.

19.  At the Unknown Subject's direction, L.B. attempted to
pay the Unknown Subject though Paypal accounts
jonyango953@gmail.com, samuelmargaret800@outlook.com,
kahungusera@gmail.com, and angelinagreeen4040@gmail.com.
However, none of the payments worked.  The Unknown Subject then
directed L.B. to purchase $600 in Apple gift cards and send
pictures of the gift cards' information to the Unknown Subject,
which L.B. did.  The Apple gift cards were almost immediately
cashed.  The Unknown Subject continued to demand money from
L.B., at which point, L.B. notified his parents.

**F.    Sextortion of 18-Year-Old Victim D.G. on September 6,
2021, in Monument, Colorado**

20.  According to an incident report filed with the FBI's
Internet Crime Complaint Center, 18-Year-Old Victim D.G.
reported that on September 6, 2021, 18-Year-Old Victim D.G.
reported that he sent "explicit pictures" of himself to the an
an Unknown Subject posing as someone named "Sofia Perez" on
Instagram.  The Unknown Subject then threatened to distribute
D.G.'s images online to D.G.'s Instagram and Facebook contacts
if D.G. did not pay $500.

21.  D.G. reported the Unknown Subject communicated with
D.G. via an Instagram account associated with the name "Sofia
Perez" and the WhatsApp Account 408-883-5483.

### G. Child Pornography Production and Sextortion of 16-Year-Old Victim J.B. on September 18, 2021, in Ferdinand, Indiana

22. According to an FBI online tip, the adult sister of 16-Year-Old Victim J.B. reported that on September 18, 2021, J.B. sent a nude photograph of himself over Instagram to an Unknown Subject, posing as a girl his age. The Unknown Subject then threatened to "ruin his [J.B.'s] reputation" by distributing J.B.'s nude photo and chats online if J.B. did not send the Unknown Subject $500. The Unknown Subject directed J.B. to purchase an Apple gift card and send the card information. J.B. purchased a $30 dollar Apple gift card and sent the card information to the Unknown Subject.

23. The Unknown Subject communicated with J.B. via direct message using Instagram "SUBJECT ACCOUNT 1"; via text message from Google Voice phone number 408-883-5483 ("SUBJECT ACCOUNT 7"); and via iMessage from phone number 973-963-5762 ("SUBJECT ACCOUNT 8"). The Unknown Subject had attempted to transition the chat conversation from Instagram to WhatsApp account 408-883-5483; however, J.B. did not have a WhatsApp account.

24. J.B.'s sister further reported that the Unknown Subject threatened J.B. into giving the Unknown Subject the password to J.B.'s Instagram account @thejoelbueltel ("SUBJECT ACCOUNT 6"). The Unknown Subject then took over J.B.'s Instagram account, and threatened to post J.B.'s nude photo on J.B.'s Instagram account if J.B. did not pay. The Unknown Subject did not give J.B. back control of his Instagram account,

and J.B.'s sister reported that she and J.B. were unable to have it deleted.

**H.   Sextortion of 19-Year-Old Victim R.B. on October 23, 2021, in Kirbyville, Texas**

25.   According to an incident report filed with the FBI's Internet Crime Complaint Center, 19-Year-Old Victim R.B. reported that on October 23, 2021, with an Unknown Subject who posed as a younger looking woman on Instagram and WhatsApp, and that R.B.  sent the Unknown Subject "inappropriate pictures and videos" of himself.  The Unknown Subject then threatened to send R.B.'s images to R.B.'s Instagram friends and work contacts if R.B. did not send the Unknown Subject money.  R.B. sent the Unknown Subject $500 via eBay gift cards, and $600 via Visa cards.  The Unknown Subject demanded that R.B. pay an additional $1,000, and when R.B. did not pay, the Unknown Subject called R.B. and threatened his life and his family's lives.

26.   In his report to the FBI, R.B. did not clearly identify the  Unknown Subject's Instagram and WhatsApp accounts, but R.B. listed the Unknown Subject's phone number as 408-883-5483 ("SUBJECT ACCOUNT 7").

**I.   Sextortion of 19-Year-Old Victim C.T. on November 9, 2021, in Knoxville, Tennessee**

27.   According to an incident report filed with the FBI's Internet Crime Complaint Center, 19-year-old victim C.T. reported that on November 9, 2021, an Unknown Subject using Instagram Account @sofiaperez15221 ("SUBJECT ACCOUNT 3") pretended to be sexually interested in C.T. and thereby tricked C.T. into sending "explicit" images of his face and genitals to

the Unknown Subject. The Unknown Subject then threatened to distribute C.T.'s images online if C.T. did not pay $500.

28.  The Unknown Subject further demanded C.T.'s Instagram account login credentials until C.T. paid the money and in exchange for not distributing C.T.'s images. C.T. provided his Instagram login. The Unknown Subject then took control of C.T.'s Instagram account @cthayer25 ("SUBJECT ACCOUNT 5"). The Unknown Subject retained control of C.T.'s Instagram account.

29.  At the Unknown Subject's direction, C.T. attempted to send money to PayPal accounts mbuthimilka12@hotmail.com, leahmukindup60@yahoo.com, getrudanakhokho@yahoo.com, and apiyoedwine@outlook.com; however, none of the transactions were successful.  The Unknown Subject then directed C.T. to purchase a $500 Apple gift card as a means of payment.

30.  C.T. further reported that the Unknown Subject communicated with C.T. over Snapchat account @sofiaperez4846, and phone number 973-963-5762.

**J.   Sextortion of 19-Year-Old Victim R.W. on December 6, 2021, in Thousand Oaks, California**

31.  On December 6, 2021, 19-Year-Old Victim R.W. reported to the FBI's Internet Crime Complaint Center that the same day he had sent sexually explicit photos of himself to an Unknown Subject who then demanded money in exchange for not distributing R.W.'s images online. R.W. reported that the Unknown Subject used phone number 408-883-5483 ("SUBJECT ACCOUNT 7").

32.  On December 7, 2021, R.W. further reported to Ventura County Sheriff Office that the Unknown Subject first contacted

him via Instagram account SUBJECT ACCOUNT 2, and their conversation continued via WhatsApp Account 408-883-5483. The Unknown Subject enticed R.W. into sending two nude pictures of himself with his face visible. The Unknown Subject then threated to distribute R.W.'s photos to R.W.'s friends on Instagram if R.W. did not send the Unknown Subject $500. The Unknown Subject told R.W. to send the money to Venmo account @lupack23, Paypal account migwimaina@outlook.com, and Paypal account @James-Mayweather-1. R.W. did not send any money.

33. R.W. further told Ventura County Sheriffs that the Unknown Subject had sent R.W. photos indicating that the Unknown Subject has sent R.W.'s nude images to three of R.W.'s Instagram friends. R.W. did not confirm with his friends that they had received his nude images.

### K. Child Pornography Production and Sextortion of 16-Year-Old Victim J.T. on February 4, 2022, in Springfield, Missouri

34. On February 16, 2022, the mother of 16-year-old minor victim J.T., reported to the reported to the FBI's Internet Crime Complaint Center that on or about February 14, 2022, J.T. was sent a direct message from another person soliciting sexual nude images of J.T. in exchange for pornography. J.T. sent the Unknown Subject images showing his face and genitals. The Unknown Subject then threatened to distribute J.T.'s images online unless J.T. paid the Unknown Subject $500. J.T. told the Unknown Subject that he was 16-years-old, but Unknown Subject responded that he did not care and made additional threats

demanding funds.  The Unknown Subject did not provide account numbers or other details by which to send him blackmail money.

35.  J.T.'s mother further reported the Unknown Subject communicated with J.T. via Instagram Direct Message using Instagram account @sofiaperez15221 ("SUBJECT ACCOUNT 3"), and via iMessage from phone number 973-963-5762 ("SUBJECT ACCOUNT 8").

### L.    Summary of Unknown Subject's Use of Platforms to Communicate with Victims

36.  As described more fully above, the Unknown Subject used SUBJECT ACCOUNTS 1 through 4, all of which were Instagram accounts to communicate with victims.

37.  The Unknown Subject also used SUBJECT ACCOUNT 7 – a Google Account using Google Voice phone number 408-883-5483 – to communicate with victim J.B.

38.  A Law Enforcement data base and open-source search revealed that the phone number matching SUBJECT ACCOUNT 7 and [whatever you name the recurring WhatsApp number] was registered to Bandwidth.com LLC, and subleased to Google LLC, as a Google Voice phone number.  Based on my training and experience, Google Voice is a voice over IP (VOIP) service provided by Google, LLC to its users; and many Google Voice phone numbers are subleased from Bandwidth.com LLC.  Therefore, the Unknown Subject is believed to have used SUBJECT ACCOUNT 7Google account's Google Voice phone number 408-883-5483 ("SUBJECT ACCOUNT 7") to communicate directly with at least one victim.

39.   The Unknown Subject also used SUBJECT ACCOUNT 8 – an Apple account using phone number 973-963-5762 – to communicate with victims.   As previously described, victims J.B. and J.T. specifically reported receiving iMessages from phone number 973-963-5762. Based on my training and experience, iMessages are text messages sent from an Apple device, and Apple requires users of their devices to set up a device using an Apple account. Therefore, the Unknown Subject is believed to have communicated directly with multiple victims using an Apple device associated with an Apple account.

40.   Further, the Unknown Subject took over at least two of the victims' Instagram accounts, and likely used the accounts to further the enticement and blackmail scheme.  Those Instagram accounts were @cthayer25 ("SUBJECT ACCOUNT 5") and @thejoelbueltel ("SUBJECT ACCOUNT 6"). In my training and experience, sextortion subjects will attempt to take over a victim's social media to gain greater leverage over the victim. The subjects manipulate the victim into giving over control of their account by promising to not distribute the victim's explicit images in exchange for the account's password.  With control of the victim's account, the subjects can demand payment for returning the account. Additionally, subjects magnify the victim's fear of public embarrassment and shame by threatening to post the victim's images on the victim's own social media and distributing the images to friends and family directly from the victim's account.  Direct access to the victim's social media contacts also widens their access to additional victims. For

example, a subject could have the victims account "friend" the subject's fraudulent account.  Thereafter, when the subject's fraudulent account attempts to make contact with a new victim (one of the original victim's social medial friends), the new victim will see that the subjects account is already friends with someone they know.  This scheme effectively adds legitimacy to the fake account and increases the likelihood a new victim will engage with the fake account.

### IV.   PERSERVATION REQUESTS

41.  Preservation requests were sent to Meta on December 30, 2021, for Instagram accounts @sofia_perez136 ("SUBJECT ACCOUNT 1"); @sofiaperez_201 ("SUBJECT ACCOUNT 2"); and @sofiaperez15221 ("SUBJECT ACCOUNT 3").

### V.   BACKGROUND ON SOCIAL MEDIA ACCOUNTS AND THE PROVIDERS

42.  In my training and experience, I have learned that providers of social media services offer a variety of online services to the public.  Providers, like the PROVIDERS, allow subscribers to obtain accounts like the SUBJECT ACCOUNTS. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-

mail addresses, and, for paying subscribers, means and source of
payment (including any credit or bank account number).  Some
providers also maintain a record of changes that are made to the
information provided in subscriber records, such as to any other
e-mail addresses or phone numbers supplied in subscriber
records.  In my training and experience, such information may
constitute evidence of the crimes under investigation because
the information can be used to identify the user(s) of an
account.

43.  Therefore, the computers of the PROVIDERS are likely
to contain stored electronic communications and information
concerning subscribers and their use of the PROVIDER's services,
such as account access information, e-mail or message
transaction information, and account application information.
In my training and experience, such information may constitute
evidence of the crimes under investigation because the
information can be used to identify the user(s) of a SUBJECT
ACCOUNT.

44.  A subscriber of the PROVIDER can also store with the
PROVIDER files in addition to e-mails or other messages, such as
address books, contact or buddy lists, calendar data, pictures
or videos (other than ones attached to e-mails), notes, and
other files, on servers maintained and/or owned by the PROVIDER.
In my training and experience, evidence of who was using an
account may be found in such information.

45.  In my training and experience, e-mail and social media
providers typically retain certain transactional information

about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

46. In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

## VI.   BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDER[S]

47.   I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal activity.  Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account.  Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account.  For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a

warrant requiring the PROVIDER to turn over all information associated with a SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

48.   Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

49.   I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures

set forth in Attachment B, is necessary to find all relevant evidence within the account.

50.   This application seeks a warrant to search all responsive records and information under the control of the PROVIDERS, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

51.   As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

52.   I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

53.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business

by providers.  For example, if an account is not accessed within
a specified time period, it -- and its contents -- may be
deleted.  As a consequence, there is a risk that the only record
of the contents of an account might be the production that a
provider makes to the government, for example, if a defendant is
incarcerated and does not (perhaps cannot) access his or her
account.  Preserving evidence, therefore, would ensure that the
government can satisfy its Brady obligations and give the
defendant access to evidence that might be used in his or her
defense.

54.  The subscriber will also generally need to use a
password that will allow the user to gain access to the account.
Many providers do not store the password directly, rather they
use an algorithm (often referred to as a "hashing" algorithm)
that is performed on the password and generates a new random of
string of numbers and characters, which is what the provider may
store.  When a user enters his or her password, the hashing
algorithm is performed on the password before it is presented to
the provider, and the provider will verify the hash value for
the password (rather than the password itself) to authorize
access to the account.  As an added security feature, some
providers insert additional text before or after the password,
which additional text is referred to as "salting" the password.
The hashing algorithm is then performed on the combined password
and salt, which is the hash value that will be recognized by the
provider.  Alternatively or in addition to passwords, users may
be required to select or propose a security question, and then

provide an answer, which can be used to substitute for a
password or to retrieve or reset a user's password.

55.   In my training and experience, providers also keep a
record of search queries run by the user of the account, whether
searches within the services of the provider for persons,
content, or other accounts (such as if a user is trying to find
the account of an acquaintance), or broader Internet searches.
In some instances, providers may also keep records of which
websites or contents were "clicked on" as a result of these
searches.  This information is helpful in the context of the
case to show the topics about which the user was trying to
obtain more information or conduct research, and is relevant for
"user attribution" evidence, analogous to the search for
"indicia of occupancy" while executing a search warrant at a
residence.

56.   I know based on my training and experience that
providers of e-mail or social media services generally have
access to and store the web or Internet browsing history of the
user while he or she is logged into an account.  That history
can include the names and specific websites or URLs/URIs
(Uniform Resource Locators or Indicators) of the sites that have
been visited.

57.   Providers of similar services will often keep track of
what is referred to as user agent string, which contains
information about the type of computer, operating system, and
web browser used to access the service.  User agent string can
include:  web requests or HTTP requests (hypertext transfer

protocol is the protocol by which many web pages are transmitted
between servers and clients or users); logs containing
information such as the requestor's IP address, identity and
user ID, date and timestamp, request URL or URI (Uniform
Resource Locator or Indicator, i.e., a website address), HTTP
protocol version, referrer, and similar information; login
tracker logs; account management logs; and any other e-mail or
social media accounts accessed by or analytics related to the
SUBJECT ACCOUNT.  These can be used to determine the types of
devices used while accessing the SUBJECT ACCOUNT, as well as
data related to the user's activity while accessing the SUBJECT
ACCOUNT.

58.  Users of accounts are often required to include an e-
mail account as well as a phone number in subscriber records.
The e-mail account may be an e-mail account hosted at the same
provider, or an account at a different provider.  The e-mail
account is referred to by a number of names, such as a secondary
e-mail account, a recovery e-mail account, or an alternative e-
mail account or communication channel.  That e-mail account is
often used when the identity of the user of the primary account
(here, a SUBJECT ACCOUNT) needs to be verified, for example if a
password is forgotten, so that the provider can confirm that the
person trying to access the account is the authorized user of
the account.  Similarly, the telephone number used in subscriber
records is often used to send a passcode via text (or "SMS")
that must be presented when trying to gain access to an account,
either in a similar scenario where a user forgot his or her

password, or when users implement what is referred to as "two-factor authentication" (where the password is one factor, and the passcode sent via text message to a mobile device is a second).  In either scenario, the user of a primary e-mail account (a SUBJECT ACCOUNT) and a secondary e-mail account or phone number listed in subscriber records are very often the same person, or at least are close and trusted and/or working in concert.  That is because access to either the secondary e-mail account or to the phone number listed in subscriber records can allow access to the primary account.

59.  Providers also frequently obtain information about the types of devices that are used to access accounts like the SUBJECT ACCOUNT.  Those devices can be laptop or desktop computers, cellular phones, tablet computers, or other devices. Individual computers or devices are identified by a number of different means, some of which are assigned to a particular device by a manufacturer and connected to the "hardware" or the physical device, some are assigned by a cellular telephone carrier to a particular account using cellular data or voice services, and some are actually assigned by the provider to keep track of the devices using its services.  Those device identifiers include Android IDs, Advertising IDs, unique application numbers, hardware models, operating system versions, unique device identifiers, Global Unique Identifiers or "GUIDs," serial numbers, mobile network information, phone numbers, device serial numbers, Media Access Control ("MAC") addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity

Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile
Identification Numbers ("MIN"), Subscriber Identity Modules
("SIM"), Mobile Subscriber Integrated Services Digital Network
Numbers ("MSISDN"), International Mobile Subscriber Identifiers
("IMSI"), or International Mobile Equipment Identities ("IMEI").
Apple, one of the primary suppliers of mobile devices used to
access accounts like the SUBJECT ACCOUNT, had previously used an
identifier that was unique to the hardware of its devices, such
that details of a device's activity obtained from a particular
application or "app" could be used to target advertisements for
the user of that device.  Apple replaced that hardware-based
identifier with the Apple advertiser ID or IDFA that is still
unique to a particular device, but which can be wiped and re-
generated anew by a user if a user chooses to do so.  Most
users, however, do not know that the IDFA exists, and therefore
are unaware that their device's activity can be correlated
across different apps or services.  Google uses a similar
advertiser ID referred to as an AAID.

60.  These device identifiers can then be used (a) to
identify accounts accessed at other providers by that same
device, and (b) to determine whether any physical devices found
in the course of the investigation were the ones used to access
a SUBJECT ACCOUNT.  The requested warrant therefore asks for the
device identifiers, as well as the identity of any other account
accessed by a device with the same identifier.

61.  Providers of e-mail and social media often maintain,
have access to, and store information related to the location of

the users of accounts they service.  That information may be obtained by the provider in a number of ways. For example, a user may access the provider's services by running an application on the user's phone or mobile device, which application has access to the location information residing on the phone or mobile device, such as Global Positioning System (GPS) information.  It may also be accessible through "check-in" features that some providers offer that allow users to transmit or display their location to their "friends" or "acquaintances" via the provider.

**A.    Services Provided by Instagram**

62.    Based on a review of information provided by Instagram regarding its services, information provided by other law enforcement officers, and/or my training and experience, I am aware of the information contained in this section of the affidavit regarding Instagram.

63.    Instagram is a service owned by Facebook and is a free-access social networking service, accessible through its website and its mobile applications, that allows subscribers to acquire and use Instagram accounts, like the SUBJECT ACCOUNT[S], through which users can share messages, multimedia, and other information with other Instagram users and the general public.

64.    Facebook collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address,

telephone numbers, credit card or bank account number, and other personal identifiers. Facebook keeps records of changes made to this information.

65. Facebook also collects and retains information about how each user accesses and uses Instagram. This includes information about the IP addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, as well as session times and durations. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

66. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

67. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image

from Instagram to a connected image printing service.  Facebook maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Facebook and third-party websites and mobile apps.

68.  Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

69.  Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Facebook to access the contact lists on their devices to identify which contacts are Instagram users.  Facebook retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Facebook to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

70.  Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding

their name, a photo, a short biography ("Bio"), and a website address.

71.  One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.  Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Facebook's servers.

72.  Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

73.  An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Facebook's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

74.   Instagram allows users to broadcast live video from
their profiles.  Viewers can like and add comments to the video
while it is live, but the video and any user interactions are
removed from Instagram upon completion unless the creator
chooses to send the video to IGTV, Instagram's long-form video
app.

75.   Instagram Direct, Instagram's messaging service,
allows users to send private messages to select individuals or
groups.  These messages may include text, photos, videos, posts,
videos, profiles, and other information.  Participants to a
group conversation can name the group and send invitations to
others to join.  Instagram users can send individual or group
messages with "disappearing" photos or videos that can only be
viewed by recipients once or twice, depending on settings.
Senders can't view their disappearing messages after they are
sent but do have access to each message's status, which
indicates whether it was delivered, opened, or replayed, and if
the recipient took a screenshot.  Instagram Direct also enables
users to video chat with each other directly or in groups.

76.   Instagram offers services such as Instagram Checkout
and Facebook Pay for users to make purchases, donate money, and
conduct other financial transactions within the Instagram
platform as well as on Facebook and other associated websites
and apps.  Instagram collects and retains payment information,
billing records, and transactional and other information when
these services are utilized.

77.   Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Facebook retains records of a user's search history and followed hashtags.

78.   Facebook collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Facebook to personalize and target advertisements.

79.   Facebook also uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Facebook maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  In my training and experience, this data can provide information that can also be used to identify the user(s) of a SUBJECT ACCOUNT.

80.   In some cases, Instagram users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support

services, as well as records of any actions taken by the provider or user as a result of the communications.

81.   For each Instagram user, Facebook collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

82.   In my training and experience, the stored communications and files described above connected to a SUBJECT ACCOUNT may provide direct evidence of the offenses under investigation and may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.  In addition, emails, instant messages, internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

83.   In my training and experience, a user's account activity, logs, stored electronic communications, and other data retained by Facebook can also be used to identify the user(s) of a SUBJECT ACCOUNT.  For example, subscriber information, IP address logs, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crimes under investigation.

B.    **Services Provided by Google**

84.  In my training and experience, I have learned that Google provides a variety of online services, including e-mail, document storage, mobile operating systems, translation services, software coding tools, malware analysis, social media accounts, applications development tools, video and photograph sharing and storage, web feed management tools, personalized home pages, news aggregation tools, a Google account "dashboard" tool, an online retail storefront offering applications for free and for sale, website analytic tools, calendars, web browsers, mapping tools, location tracking tools, and telephone and voicemail transcription to the public.

85.  Google offers numerous services which enhance the user's Internet experience, including Google Dashboard, Google Reader, Google News, and Google Groups.  Google News and the now-discontinued Google Reader are website feed aggregators that allowed a user to view website articles and news in one centralized location.  Google Groups are e-mail groups whereby one person can send an e-mail to an e-mail address that serves as the "group," and the message or e-mail is either or both posted to a centralized location and/or sent to everyone who is currently subscribed to the group via e-mail; each group is generally set up using a Google account.

86.  Evidence of who it is that a user of an e-mail or social media account had contacted and for what purpose can also reside in the information likely stored on a SUBJECT ACCOUNT at Google.  For example, photographs can be stored not only as

attachments to e-mails, but they can be linked to a particular contact stored in connection with an e-mail account, they can be stored in connection with a particular "friend" or event on a Google+ account, or they can be stored in a Google Photos (formerly Picasa) web album.  Albums can be compiled for a particular trip or occasion, documenting who was present, when it took place, and where it was -- for example by recovering location information that is sometimes stored in metadata, or what is referred to as "EXIF data" on digital photographs. Likewise, personal videos can be uploaded to or downloaded from video services such as Google's YouTube.  All of this data can assist in identifying the true identity of the account user and persons with whom the user of the account has been in contact.

87. Aside from photos, Google+, Google Plusone, and the discontinued iGoogle are social networking services similar to Facebook.  Data residing on Google+, Google Plusone, and iGoogle accounts is likely to provide information regarding the true identity of the person(s) using a SUBJECT ACCOUNT, the identities of persons with whom the user of a SUBJECT ACCOUNT has been in contact, the nature of those contacts, and whether any such contacts were related to the subject matter of the investigation described above.  Furthermore, a user's history that relates to web browsing, web searches, and certain activity related to Google services or applications (or "apps") are stored in an account's Google History, or Google Web & App Activity.

88.   In addition to storing photographs, calendars, and other evidence related to social media, a subscriber can also sign up for other services at Google, such as Google Drive and Google Docs, which allow users to store any kind of documents.

89.   Further, Google Maps provides a mapping tool that allows users to save locations, such as their home and work locations, create custom maps, make changes and edits to public places, "star" locations, and create private labels for locations.  Google Location History provides Global Positioning System (GPS) location information.  All of these services can be used to identify where an individual is and has been physically located.  Google also in some instances maintains records of the nearby wireless or "Wi-Fi" access points (that can be used to connect to the Internet) or the cell towers connected to a device that is accessing a Google account.

90.   Google offers services which interpret and translate text, including Google Translate (which allow users to paste text in one language that will be translated into another) and Google Translator Toolkit (which includes more functionality and collaboration), which can translate text in 345 source languages into 345 target languages.  The translation service is Internet-based, so it can be used by the user of the account to translate e-mails received as well as websites visited.

91.   Over the last several years, Google has developed a number of mobile telephone technologies, including the development of the Android mobile operating system, Android Market, and Google Talk.  The Android operating system is used

on the majority of the world's touch-screen mobile devices and smartphones, and facilitates the downloading and running of games and applications, sending of text and voice messages, connecting to and searching the Internet, and providing of GPS and location services, camera services for the taking of photographs and videos (including video calling), clock and calendar services, and e-mail services, and storing of contact lists and documents.  The Google Play service provides the virtual storefront at which applications can be downloaded and updated.  Google Talk is an instant messaging service that provides both text and voice communication.  I know from experience that Android applications including these are generally downloaded from the Android Market and Google Play services.

92.  Google also uses "unique application numbers," which Google uses to record information such as the operating system type and the application version number used to access Google by a particular device.  Google maintains these unique application numbers to track and collect information related to a particular device accessing Google services, which is recognized when updating Google services or software on a device using a Google account.

93.  Google offers a service called Google Hangouts, which allows Google users to communicate by means of video calls, phone or audio calls, or written messages.  Google also offers telephony and voicemail services called Google Voice and Google Talk.

94.  Google also offers its own web browser, a program
called Google Chrome, which can be used instead of other web
browsers such as Microsoft Internet Explorer or Mozilla Firefox.
Users who have a Google account can use Google Chrome on
multiple devices, and can decide which information "syncs" or
synchronizes across multiple devices that are running Google
Chrome.  Devices that can be synced include computers, Google's
own computers called Chromebooks, devices running Google's own
Android operating system, or iPhones or iPads (devices made by
Apple, Inc. that use Apple's proprietary operating system).
Users have the option to sync all data across multiple devices,
or only certain information by checking certain boxes, and can
choose to require a passphrase to sync between different
computers as well as to encrypt any passwords stored by Google
Chrome.

95.  Google also tracks users across various devices,
services, and "apps."  One way that it does so is by assigning a
Google Accounts and ID Administration ("GAIA") ID.  Google is
therefore able to determine when activities are connected to
that GAIA ID.

96.  Google also now offers users the ability to exercise
certain control over email messages, for example by allowing
users to send expiring messages, to require a recipient to
insert a password to open a message, to retract access to a sent
message, or to control whether a recipient can forward a
message.

97.   Depending on whether a user of a Google account implemented Google's two-factor authentication system (which can require the user to enter both a user-name and password and a code sent to one's cell phone), Google may also have authentication logs of when the user successfully authenticated or identified him- or herself when logging into an account. Similarly, for certain mobile devices, a password for the specific "app" installed on the mobile device may be generated and used to maintain access.

98.   Among the services offered by Google is FeedBurner, which is a web feed management tool that compiles web content from multiple sources (such as news outlets, websites, or e-mail) and eliminates the need to continuously check a website or source because updates are automatically sent to persons who subscribe to that source via FeedBurner.  For publishers of content, FeedBurner also tracks internet traffic and conducts traffic analysis of who is subscribing and reading the content.

99.   For this reason, Attachment B in the requested warrant to Google requires Google to provide information related to any Google service used by a SUBJECT ACCOUNT.

**C.   Information Stored by Google that Relates to Android Devices**

100. As mentioned above, Google offers a free mobile operating system (OS) product called Android.  When a new device is established running the Android OS, it is assigned an Android ID and if the device has a telephony module, it likely has an International Mobile Equipment Identity (IMEI) number, which may

be interchangeable with an Android ID.  Google and other
providers of e-mail and social media use various identifiers,
such as Global Unique Identifiers or "GUIDs," to track users and
the devices users are using as well.

101. The Android OS will also assign a user-specific
"Advertising ID" that can be used by users and developers to
control and monetize the applications they develop.

102. I know from my experience and in talking with FBI
employees familiar with the Android developer toolkit that
Google stores certain information relating to each Android
device that is activated.

103. Among the information that Google stores are records
that might indicate who the owner of the IMEI/Android ID is,
such as the Google account that was used to establish the
Android device, Google accounts accessed by the device, records
related to the hardware device the Android OS is operating on,
e-mail accounts associated with the IMEI/Android ID, IP
addresses used by the device and used to access the Google
account, search queries performed on the Android device, web
browsing performed on the Android device, machine cookie
information for the Android device, images used to establish the
Google "Face Unlock" feature, phone call logs, text message
content, stored voicemails, contact lists stored on the device,
stored photographs, the phone number of the device, applications
or "apps" downloaded by the device, apps currently and
historically accessed by the device, bookmarks, favorites lists,
memos and files saved to the device, and device security

settings.  Some of these applications or "apps" store or back-up data remotely to Google, rather than only storing it locally on the device or phone itself.

104. Additionally, Google allows users to sync certain applications to the Android account that can be used to identify the identity of the user of the device.

105. Google also stores information related to the location of the Android device, including clock and time zone settings, Global Positioning System (GPS) location history, language codes, and Google Maps location information.

106. Google provides cloud services which allow a user to save content on the Android device to the cloud; in the event the device malfunctions the user is able to quickly recover their data and information from this cloud back-up image.

**D.    Services Provided by Apple, Inc.**

107. Based on a review of information provided by Apple regarding its services, information provided by other law enforcement officers, and my training and experience, I am aware of the information contained in this section of the affidavit regarding Apple.

108. Apple is a United States consumer electronics company that produces devices, including the iPhone, iPad, and iPod Touch, Apple Watch, and Apple TV all of which use Apple operating system software (including iOS, iPadOS, watchOS, and tvOS)the iOS operating system, and desktop and laptop computers based which use on the Mac OS operating system.

109. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

a.   Apple provides email service to its users through email addresses at the domains mac.com, me.com, and icloud.com.

b.   iMessage and FaceTime allow users of Apple devices to communicate with each other in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.  The iMessage and FaceTime services are exclusive to Apple devices.

c.   iCloud is a file hosting, storage, and sharing service provided by Apple.  iCloud can be utilized through numerous iCloud-connected services and can also be used to store Apple device backups and data associated with third-party apps.

d.   iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store

presentations, spreadsheets, and other documents.  iCloud Tabs
enables iCloud to be used to synchronize webpages opened in the
Safari web browsers on all of the user's Apple devices.  iWork
Apps, a suite of productivity apps (Pages, Numbers, and
Keynote), enables iCloud to be used to create, store, and share
documents, spreadsheets, and presentations.  iCloud Keychain
enables a user to keep website username and passwords, credit
card information, and Wi-Fi network information synchronized
across multiple Apple devices.  iCloud can also be used to back
up various settings and history of a user's activity, such as
searches and web history.

  e.   Game Center, Apple's social gaming network,
allows users of Apple devices to play and share games with each
other.

  f.   Find My allows owners of Apple devices to
remotely identify and track the location of, display a message
on, and (in some instances) wipe the contents of devices
registered with the service.

  g.   Location Services allows apps and websites to use
information from cellular, Wi-Fi, Global Positioning System
("GPS") networks, and Bluetooth, to determine a user's
approximate location.

  h.   The App Store and iTunes Store are used to
purchase and download digital content.  Apps can be purchased
and downloaded through the App Store on Apple devices, or
through iTunes Store on desktop and laptop computers running
either Microsoft Windows or Mac OS.  Additional digital content,

including music, movies, and television shows, can be purchased through iTunes Store.

110. Apple services are accessed through use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

111. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

112. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's

website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

113. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the Find My service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

114. Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an Apple device, Apple captures and retains the user's IP address and identifiers (depending on the type of device) such

as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

115. Apple provides users with five gigabytes of free storage space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS")

messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

116. In some cases, users may communicate directly with Apple about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Providers like Apple typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

117. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

118. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and

experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

119. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

120. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime),

or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

121. Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from the App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## VII. REQUEST FOR NON-DISCLOSURE

122. Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.  There

is reason to believe that such notification will result in
(1) endangering the life or physical safety of an individual;
(2) flight from prosecution; (3) destruction of or tampering
with evidence; (4) intimidation of potential witnesses;
(5) otherwise seriously jeopardizing the investigation; or
(6) unduly delaying trial.

123. The current investigation set forth above is not
public, and I know, based on my training and experience, child
pornography producers, and those that use sexually explicit
images as blackmail, or otherwise send extortionate threats
often will destroy digital evidence if the Subject learns of an
investigation.  In addition, if the PROVIDER or other person
notifies the targets of the investigation that a warrant has
been issued for a SUBJECT ACCOUNT(s), the unidentified Subject
might further mask their activity, threaten victims and
witnesses, and seriously jeopardize the investigation. Further,
the Subject's online tormenting threats has already resulted in
the death of at least one victim.

## VIII.    CONCLUSION

124. Based on the foregoing, I request that the Court issue
the requested warrant.  The government will execute this warrant
by serving the warrant on the PROVIDERS.  Because the warrant
will be served on the PROVIDERS, which will then compile the
requested records at a time convenient to it, reasonable cause
exists to permit the execution of the requested warrant at any
time in the day or night.

                                      _____

                                        Nathaniel L. Hines
                                        Special Agent
                                        Federal Bureau of Investigation

Subscribed to and sworn before me
on May 12, 2022.


_____
UNITED STATES MAGISTRATE JUDGE